## RANSOME CONCRETE MACHINERY CO. v. MOODY.

(Circuit Court of Appeals, Second Circuit. March 20, 1922.)

No. 199.

1. **Corporations ⬉283(4)—When increase in number of directors ratified by stockholders, corporation estopped to deny directors' acts.**

   After ratification by stockholders of the act of a board of directors in increasing their own number from three to seven, the corporation was estopped from questioning or denying the acts of the seven directors, or of a quorum thereof, except for fraud or other malfeasance in office.

2. **Corporations ⬉308(3)—Agreement with general manager as to compensation held not fraudulent per se.**

   A contract by a board of directors, employing one of their number as general manager at a salary of $10,000 a year, and percentages of the net profits varying with the amount of profits, *held* not fraudulent or wrongful per se, because of the method and quantum of the promised payment.

3. **Corporations ⬉308(3)—Directors under no obligation to consult majority stockholder as to a contract with general manager as to compensation.**

   A contract between corporate directors and the general manager, increasing his salary and providing for payment of percentages of net

---

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

profits, being a matter of business within the discretion of the board, there was no obligation on the directors or officers to consult or advise with the majority stockholders.

4. Corporations ⟨⟩308(3)—Making increase in salary of general manager retroactive held not to invalidate entire agreement.

That an agreement, made October 3, 1919, between corporate directors and the general manager for his employment for six years at an increased salary and a share of the net profits, made the increased salary retroactive, dating from January 1, 1919, did not per se invalidate the entire agreement.

5. Corporations ⟨⟩406(2), 432(5)—Within president's power prima facie to make any contract that board of directors could make; burden is on one impeaching authority of president of New York corporation to contract.

It is prima facie within the power of the president of a New York corporation to make any contract on behalf of the company which the directors would have power to make by vote of the board, and the burden is on one who impeaches his authority.

6. Evidence ⟨⟩11—Cognizance taken of existence of war and demand for concrete machinery.

The court takes cognizance that the years 1918 and 1919 were years of war, and that the product of a company manufacturing concrete machinery was in governmental demand.

7. Corporations ⟨⟩316(1)—Contracts between directors and one of their number closely scrutinized.

The relation of a director to a corporation is that of a fiduciary, and all contracts made by boards of directors with one of their number are closely scrutinized in equity.

8. Corporations ⟨⟩407(1)—Whether directors may hire one of their number as manager and increase his salary depends on honest and fair bargain.

Whether the directors of a corporation may hire one of their own number as general manager and increase his salary as seems best depends on whether the bargain was a good, fair, and honest bargain.

9. Courts ⟨⟩372(1)—Question as to dealings between director and corporation governed by federal decisions.

The question of a director's dealings with his corporation is one of general law, and the rulings of the United States courts are of controlling authority.

10. Equity ⟨⟩330(1)—Legal counterclaim in suit in equity considered, in absence of objection.

In a suit in equity to set aside a contract, a legal counterclaim for damages for breach of the contract may be considered and decided, in the absence of any objection.

11. Master and servant ⟨⟩38—Suit for wrongful discharge lies immediately on discharge.

One discharged from his employment as general manager of a corporation, in breach of his contract, may sue immediately, and demand an assessment of his damages, even before his term of employment ends.

12. Judgment ⟨⟩594—Action for discharge, brought before end of term, bars subsequent action.

An action brought for wrongful discharge, and tried on such evidence as is obtainable before the expiration of the period of employment, is a bar to any subsequent action.

13. Evidence ⟨⟩11—Notice taken of business depression.

The courts take cognizance of the existence of a period of great business depression, with profits small, and dividends largely absent.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. **Evidence ⊜21—Notice taken of practice of bookkeepers as to carrying doubtful accounts.**

The courts take cognizance of the practice of bookkeepers or accountants to carry accounts which are doubtful, but not hopeless, in what is equivalent to a suspense account.

15. **Contracts ⊜143—To be interpreted in light of experience of parties.**

Contracts are to be interpreted as far as possible in the light of experience, and of the experience of the men who made them.

16. **Master and servant ⊜70(3)—Amount charged off for depreciation properly deducted in computing profits.**

Where both parties to a contract of employment as general manager of a corporation for a salary and share of the net profits knew that a reasonable amount of charging off of depreciation, doubtful accounts, and the like was customary in good bookkeeping, and no more was charged off than was reasonably to be expected, the amount to be charged off is properly deducted in computing the net profits.

17. **Master and servant ⊜70(3)—Excess profits tax deducted in computing profits.**

Under a contract employing one as general manager of a corporation for a fixed salary and percentages of net profits, excess profits taxes are to be deducted in computing the net profits.

18. **Master and servant ⊜41(1)—Prospective damages recoverable on wrongful discharge.**

One wrongfully discharged from his employment as general manager of a corporation may recover prospective damages, or compensation for the lack of future employment.

19. **Master and servant ⊜42(2)—Discharged employee must exercise diligence to procure other employment.**

It is incumbent on a discharged employee to exercise reasonable diligence in seeking other employment.

20. **Master and servant ⊜41(6)—That discharged employee might have obtained other employment may appear from his own evidence.**

That a discharged employee might have obtained other employment need not be shown by evidence introduced by the employer, if it appears from the employee's own evidence.

21. **Master and servant ⊜42(2)—Discharged employee entitled to reasonable time to find kind of business wanted by him.**

Where one wrongfully discharged from his employment as general manager of a corporation did not intend to seek salaried employment, but was seeking an opportunity to enter a business or found one as a partner, or its equivalent, he was entitled to a reasonable time to seek and find or make the business that he wanted.

22. **Appeal and error ⊜554(2), 753(2)—Writ of error dismissed, when there was no bill of exceptions or assignment of errors.**

A writ of error to review a judgment on a legal counterclaim in suit in equity will be dismissed, where no bill of exceptions was settled, allowed, or filed, and no assignments of error were filed, as required by rule 10 of the Second Circuit Rules (235 Fed. vi, 148 C. C. A. vi).

Appeal from and in Error to the District Court of the United States for the Southern District of New York.

Suit by the Ransome Concrete Machinery Company against Robert R. Moody to set aside an alleged contract of employment with counterclaim by defendant for breach of the contract. Decree for defendant, and plaintiff appeals and brings error. Decree affirmed, and writ of error dismissed.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Plaintiff's business apparently consisted in the manufacture of concrete machinery. The contract in question provided for defendant's employment as general manager for a period of six years at a salary of $10,000 a year and percentages of the net profits, ranging from 5 per cent. on profits above $20,000 to and including $30,000 to 20 per cent. of the net profits above $80,000.

The following is the opinion of Hough, Circuit Judge, delivered in the court below, and hereinafter referred to:

The structure of this bill is so simple and the facts (in the primary sense of things done, said, or written) so fully admitted or proven, that no elaborate fact findings are thought necessary. It is sufficient to state that I regard the bill as one falling under a well-known head of equity jurisdiction, viz. to set aside a contract obtained by fraud or attempted to be made ultra vires (as matter of form, it makes no difference which), and obtain an accounting for moneys procured by defendant under color and cover of said contract. But, while the facts are practically admitted, the inferences from them are seriously in dispute, and for this reason I note as separate findings the inferences drawn by me.

(1) Owing to the long continuance in office of more than three directors of plaintiff company, not only Moody, but all other persons concerned in the transaction complained of, were well warranted (entirely apart from all other considerations) in believing the board of seven directors to be fully authorized to act in all corporate matters properly cognizable by any board of directors. This tends to negative all actual fraud.

(2) There is no proof of any mutual understanding or agreement between Moody and Robinson, whereby each of them or either of them agreed beforehand to vote for the other man's contract, in consideration of a like vote by that other.

(3) At no time was there any actual fraud worked on the plaintiff by any action of any board of directors in increasing their own number, and their action was subsequently ratified by the shareholders. For many years before October, 1919, seven directors were the expressed and recorded wish of the stockholders of plaintiff's corporation.

[1] (4) As an inference or conclusion of law, it is held that, after the stockholders' ratification at the latest, the plaintiff company was estopped from questioning or denying the acts of the seven directors, or of a quorum thereof, except for fraud or other malfeasance in office. That such estoppel may not have extended to the state of New York as the creator of the corporation is here immaterial.

[2] (5) While the mere amount of a promised compensation may be so excessive as to be evidence of fraud, the method and quantum of the promised payment to Moody, having regard to the volume and nature of the plaintiff's business, was so clearly within the business discretion of plaintiff's board of directors that it must be held that there was no wrong, fraud, or malfeasance per se in promising to pay to Moody, or to pay to both Moody and Robinson, the amounts agreed upon in the contracts of October, 1919.

(6) In respect to so much of its alleged cause of action as rests on the legal incapacity of the plaintiff through or by a quorum of its directors to make the contract in suit, the plaintiff is not guilty of laches. In respect, however, of all allegations of actual or constructive fraud, or of moral turpitude, on the part of the defendant or other directors, as there is no proof of the same, inquiry into laches is immaterial.

The foregoing findings sufficiently show that in my opinion this case is to be considered as if the seven men who honestly believed themselves directors of plaintiff in 1919, and who were honestly believed to be directors by the shareholders of the company, were in office both de jure and de facto. Thus the questions in the case become these:

(a) Could the board vote to one or more of their number largely increased compensation?

(b) Could the board make such compensation retroactive? and

(c) Is the contract of October 31, 1919, invalidated by the bald fact that without Robinson's vote, Moody's contract could not exist, and without Moody's vote Robinson's contract would not have been given?

On these questions, I hold as matter of fact and conclusions of law:

[3] (7) It is true that the Moody and Robinson contracts, and the antecedent increase in wage (as distinct from commissions) to Moody, were unknown to the majority shareholders—i. e., the Smith interests, until after October 31, 1919; but just how long after that date they became aware of what had been done does not appear. But, the matter being one of business and within the discretion of the board of directors, there was no legal, nor indeed moral, obligation on the directors or officers to consult or advise with the Smiths on any such matter.

[4] (8) As matter of law, the fact that the agreement of October 31, 1919, grants salary to date from January 1, 1919, does not per se invalidate the entire agreement. But, as matter of fact, the proofs show that Moody's increase from $600 per month to $833.33 per month was granted by Steele as president of the corporation early in the year 1919, to wit, in the month of March. In such increase of salary there was nothing fraudulent in fact, and I am satisfied from the evidence that not only this salary increase, but indeed the whole scheme of stimulating Moody and Robinson to vigorous effort, by making them quasi partners in the business by granting them shares of profits, was Steele's plan. He chose that plan out of several put to him by Moody and Robinson, and indeed personally advised it in so far as Moody and Robinson's commissions were to be computable, not upon sales, but upon "net profits."

I further find as a fact that Steele honestly regarded this plan as the best for the welfare of the company and for his own interests as a shareholder. He was doubtless irritated by the Smith refusal to expedite the original plan of practical reincorporation, and by Mr. Smith's apparent refusal to meet and confer with him (Steele). He was determined to retain Moody and Robinson in the service, some such plan of increased remuneration was necessary to effect this result, and he (Steele) adopted and pushed through the plan, scheme, and contract now complained of. It is admittedly true that Moody expected Robinson to vote for the former's contract and e converso; but such expectation rested, not upon any agreement, corrupt or otherwise, between these two men, but on the controlling fact that Steele, whom they both properly regarded as the head and chief of the corporation, had approved these two contracts, and Moody and Robinson depended upon Steele, and not upon each other, to carry through what were practically their bargains with Steele.

[5] (9) As a conclusion of law it is prima facie within the power of the president of a corporation existing under the law of New York to make any contract on behalf of the company which the directors of the company would have power to make by vote of the board; and the burden is on one who impeaches the president's authority. Such burden has not been borne in this case in respect of Mr. Moody's increase in salary, which increase was actually made by Steele as president not later than March, 1919, and which had been the subject of consideration by Steele, who had expressed favorable view thereof for some months previous; i. e., considerably before January 1, 1919.

(10) As a finding of fact it is my opinion that, regarding the history of this concern so far as we deal in evidence, the nature of its business, and the paucity of profits to and including 1918, it was a good business plan and one necessary for the growth of the corporate enterprise to attract and hold for a term of years skillful and vigorous managers, by making their compensation largely dependent upon an increase in business which they were themselves relied upon to bring about.

[6] It is true (and cognizance is taken thereof) that the years 1918–1919 were years of war, and that the product of this company was in governmental demand; but, even so, the enormous increase in the company's business and profits for 1919–1920 is strong evidence justifying (in a business way) the Moody-Robinson contracts. Thus the case narrows to inquiry whether, with honesty all around, with all the men concerned acting, not only without fraud, but in the exercise of a sound business discretion, what was done (or any part thereof) is so opposed to settled law as to require a declaration of nullity

on the part of a chancellor. I do not think that a trial court is often the place for exhaustive discussion of cases; it is sufficient to indicate the view of the law entertained by the trial judge, and I shall do this as follows:

[7] All discussion concerning de facto and de jure directors is beside the mark. Doubtless the law is as laid down in Matter of Ringler, 204 N. Y. 30, 97 N. E. 593, Ann. Cas. 1913C, 1036; but this plaintiff, by its stockholders' action, is estopped from asserting this particular variety of act ultra vires. That the relation of a director to his corporation is that of a fiduciary is undoubted (Jacobson v. Brooklyn, etc., Co., 184 N. Y. 152, 76 N. E. 1075); and it is equally clear that all contracts made by boards of directors with one of their own number, or indeed with any "insider" (to speak colloquially), are closely scrutinized in equity, and frequently overturned, when, if made with strangers, they would be far more liberally viewed.

It is not without interest to note that the leading cases (such as Godley v. Crandall, 212 N. Y. 121, 105 N. E. 818, L. R. A. 1915D, 632) on this point are brought by minority shareholders; whereas, this action is brought by the corporation itself. The minority holder is in the nature of things not estopped by corporate action in which he did not join; whereas, this corporation, and more particularly the Smith majority therein, is thoroughly estopped as to the illegality of the seven-director board. This point, however, does not affect the right of the corporation to complain of a contract obtained by actual or constructive fraud.

[8] But none of the cases known to me goes so far as to lay down the rule that directors, in all honesty and for the benefit, not only presumed, but actual, of their corporation, may not hire one of their own number as general manager and increase his salary as seems best. There is no legal yardstick; every case stands on its own bottom, and the ultimate question always is whether the contract was honest and beneficial. The decisions relied upon by defendant—McNab v. McNab Co., 62 Hun, 18, 16 N. Y. Supp. 448, affirmed 133 N. Y. 687, 31 N. E. 627; Mitchell v. Forest, etc., Co., 107 Misc. 709, 176 N. Y. Supp. 157, affirmed 187 App. Div. 743, 176 N. Y. Supp. 157; Commercial, etc., Co. v. Northampton, etc., Co., 115 App. Div. 388, 100 N. Y. Supp. 960—seem to me conclusive on this point. On the reason of the matter it would be inadvisable to lay down any hard and fast rule, or to make any legal yardstick. The question is always one of fact; i. e., was the bargain a good, fair, honest bargain? I find this bargain is entitled to all of those adjectives.

[9] It may further be observed that this question of a directors' dealing with his corporation is one of general law; wherefore (although no radical divergence is perceived between the federal decisions and those of New York) the rulings of the courts of the United States are of controlling authority. The general rule has been laid down in this circuit, in Re Franklin Brewing Co. (C. C. A.) 263 Fed. 512. Cowell v. McMillin, 177 Fed. 25, 100 C. C. A. 443, and Stewart v. St. Louis, etc., Co. (C. C.) 41 Fed. 736, are relevant. My view of the main case may be summed up thus:

The bill primarily rests on the theory that all the acts of the directors of 1919 were null, because there never was any legal board after the stockholders assumed to create more than three directors. The corporation, by the action of its shareholders, is estopped from asserting or maintaining this position. Thus the primary object of the bill fails; but there are sufficient allegations therein to require an answer to the question whether, in making the arrangements that were made with Moody and Robinson, the majority of the board of directors were or were not guilty of fraud, actual or constructive.

I do not care to enter into the difference (if there be one) between these two kinds of frauds. It has been held as a matter of fact that there was no fraud, and as matter of law that, where the influence (but not the actual vote) of a director is used to procure corporate action of pecuniary benefit to himself, the transaction is not void, but voidable, and reasons must be found to make it voidable. In my opinion no reason is found in this record. Therefore the bill, viewed as one to obtain rescission on the ground of fraud, also fails.

In making the above rulings it may be noted that no compensation of any kind has been given to either Moody or Robinson for his services as director. The office or employment of general manager or of sales manager was entirely distinct from the directorate.

[10] Thus is reached the counterclaim, a pleading singularly like that shown in American Surety Co. v. American Mills Co. (2d C. C. A., April 13, 1921) 273 Fed. 67. This counterclaim is a pure action at law, to which fact I called the attention of parties at the outset of the case; but nevertheless both sides have gone on, taken testimony, argued the matter, and neither in pleadings, nor during the taking of testimony, or at the close thereof, has any effort been made to get the counterclaim out of the case.

I am not sure whether a court of equity is required to consider and enforce a counterclaim of this nature; but the decision last cited is sufficient authority for saying that the trial court in equity is permitted, in the absence of any objection, so to consider and decide the defendant's demand. For this reason I shall proceed to do so. The amount and quantity of evidence is always matter most important in assessment of damages.

[11] Of Moody's right to begin suit immediately on discharge and demand assessment of his damages, even before his term of employment was ended, there is no doubt. Pierce v. Tennessee, etc., Co., 173 U. S. 1, 19 Sup. Ct. 335, 43 L. Ed. 591; Semet, etc., Co. v. Wilcox, 143 Fed. 839, 74 C. C. A. 635, certiorari denied 202 U. S. 617, 26 Sup. Ct. 764, 50 L. Ed. 1173; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; American, etc., Co. v. Boyd (C. C.) 148 Fed. 258. In an action so brought and tried before the expiration of term, the rule of damages is not different from that laid down years ago in Howard v. Daly, 61 N. Y. 362, 19 Am. Rep. 285, a decision which is one of Prof. Dwight's essays on historic law. It was followed without any discussion in this circuit in Park, etc., Co. v. Bushnell, 60 Fed. 583, 9 C. C. A. 138.

[12] And an action so brought and tried upon such evidence as is obtainable, even long before the expiration of the employment period, is a bar to any subsequent action. Labatt, Master and Servant, vol. 1, p. 1091 et seq., and the cases cited. Under these authorities such cases as Schroeder v. California, etc., Co. (D. C.) 95 Fed. 296, and Darst v. Mathieson, etc., Works (C. C.) 81 Fed. 294, must be regarded as overruled.

The testimony on damages before this court is indeed small. It is known that Moody received his last monthly salary in October, 1920, and that since that time he has obtained no remunerative occupation. But it is also true that by his own evidence he does not want salaried employment. My inference is that he is in his own estimation above it; he is looking for an opportunity to enter a business or found one as a partner or the equivalent of a partner. In short, he is making no effort to find salaried employment at any rate of compensation, and he does not intend to make such effort at present. As for his commissions, it is in evidence that after, and inferably in large part as a result of the labors of the defendant and Robinson, the plaintiff's profits jumped from a little over $4,000 in 1917, through about $29,000 in 1918, to upwards of $150,000, in 1919, and more than $160,000 in 1920. There the evidence stops, except for the statement of plaintiff's auditor that it would be impossible, except as the result of some months of work, to state the profits of the company for the elapsed portion of 1921, while as for the future there is no evidence, and it appears to me that in the nature of things there can be none.

[13] It is, however, legitimate to mention that of which the court may take cognizance, viz. that the present and an indefinite time for the future is a period of great business depression, with profits small and dividends largely absent. Such times of scarcity recur according to obscure laws, and it is perhaps for this reason that the average of the past is usually considered as some evidence (not very good) of the probable occurrences of the future. At all events, this is the best evidence that this case affords.

Before considering these figures, two questions raised at the hearing may be considered:

(1) In computing net profits is it permissible to charge off (for instance) against the apparent excess of sales over expenses in 1919 losses incurred before 1919, but becoming hopeless in that year? In other words, how much of suspense account or its equivalent should be charged off in any one fiscal year?

(2) Is the percentage of Moody's commissions computable before or after the payment for the year of computation of excess profits or income tax.

Neither of these questions, when it comes to assessing damages as by a jury, is of vital importance in dollars and cents, but my view of them is as follows:

[14-16] Cognizance is taken of the practice of bookkeepers or accountants to carry what is the equivalent of a suspense account; i. e., for example, still to carry as an asset, but a doubtful one, demands the enforcement of which is doubtful, but not hopeless. Exactly how much of such doubtful assets may be charged off in one year is a matter of degree. Contracts are to be interpreted as far as possible in the light of experience, and of the experience of the men who made them. Both parties to this contract knew that a reasonable amount of charging off of depreciation, suspense, and the like was customary in all good bookkeeping, and there is no evidence in this case that any more charging off was done than was reasonably to be expected.

[17] As to the second proposition, I agree with the reasoning of Patton, etc., Syndicate v. Etherington, [1919] 1 Ch. 306, in respect of excess profits tax. As to the national income tax I express no opinion, because after reflection the whole amount involved is too small to affect results. The point is very perplexing, as I am firmly of opinion that no well-advised employer would use the phrase "net profits" so that a servant, in receipt of commission, would be sure of his share of what the agreement called "profits," and yet, after paying the so-called income tax, the employer would have no profits left.

On the other hand, contemporary exposition is always of great importance, and it is in evidence that Moody was paid his share of net profits for 1919 before the deduction of any income tax, and such payment was treated in the return as an expense of the business, which in one sense it certainly was. This procedure was in accord with the intimation of Bennett v. Millville, etc., Co., 67 N. J. Law, at page 323, 51 Atl. 706. In short, it does not seem to me that solution of this problem is necessary in this case; but I admit being influenced in respect of the quantity of Moody's recovery by what I conceive to be the plain intention of the parties, however difficult it may be to work out such intention.

[18] Thus is reached assessment of defendant's damages. As has been often said, he may recover "prospective damages," which phrase means no more than compensation for lack of future employment. It may be admitted that such damages may consist in "the contract price unpaid, in the absence of proof by [the employer] that plaintiff might have obtained other employment" American, etc., Co. v. Boyd (C. C.) 148 Fed. 258.

But there must always be some evidence on which to base any recovery. In the matter of wages or salary, there is always the evidence of the rate agreed upon between the parties, which was to continue through the term of employment; but in respect of commissions there is no evidence, except that of past years, and in the nature of things there can be no other evidence.

[19, 20] But the sentence above quoted from the Boyd Case (which is itself but a quotation from Sedgwick on Damages) does not infringe upon the rule that it is incumbent upon the discharged employee to exercise reasonable diligence in seeking other employment; nor does it mean that the evidence moving the court must be introduced by the employer. Any party who takes the witness stand may, and often does, give evidence unfavorable to some branches of his own contention.

[21] It is to me a most weighty consideration that Mr. Moody has not sought, and does not intend to seek, salaried employment; he does not want it; he prefers what most men regard as a higher and more independent style of occupation. He should therefore be entitled to that indefinite period, a "reasonable time," to seek and find or make the business that he wants.

It is matter of fact only, and really no more than an explanation of how the mind of this particular court functions when acting as a sort of jury; but I do hold that that reasonable time had not expired when this trial was begun, say June 1, 1921, and that therefore Mr. Moody is entitled to recover at the least what would have been his salary from the time of discharge to said June 1st, and his commissions on profits for the year 1920. These sums amount in my opinion to $29,185.

He is also entitled as prospective damages to compensation for losing the chance of continuing to get salary at the rate of $833.33 per month for three years and seven months, and to his chance of getting commissions for four years. Of course, the salary rate is certainly known, as above pointed out; but on this evidence I cannot estimate the future profits of this company at any more than the average profits for the years whose financial history has been proven. Such average is between $60,000 and $70,000.

When an employee, unjustly discharged, brings instant suit and promptly tries his cause, he has elected to submit his claim on testimony far less certain than would perhaps be the case if he waited for events to develop. He must be taken to prefer promptness to certainty. I do not think any one can say with any basis of fact to go on that, if Mr. Moody had continued to serve this plaintiff until the end of the six-year period, he would have received in salary and commissions after June 1, 1921, all told more than about $54,000. It is no more than a "jury guess"; it cannot be anything else; but, in my opinion, it will reasonably compensate him for the loss of that chance to presently award him $25,000.

It follows that a decree may be entered, dismissing the bill of complaint herein and sustaining the counterclaim, with an award of a money judgment in favor of the defendant Moody and against the plaintiff herein for $54,185, together with the costs of this cause.

Davis, Wagner, Heater & Holton, of New York City (Arnold L. Davis, Charles R. Coulter, and George F. Losche, all of New York City of counsel), for appellant and plaintiff in error.

Wise, Whitney & Parker, of New York City (Henry A. Wise and Cola G. Parker, both of New York City, of counsel), for appellee and defendant in error.

Before ROGERS, and MAYER, Circuit Judges, and KNOX, District Judge.

PER CURIAM. The suit was brought to declare void a contract between the parties and to require defendant to account for and pay over to plaintiff certain moneys which plaintiff claimed were improperly paid to defendant. The answer, inter alia, set up a counterclaim, and asked for a decree or judgment for such counterclaim. The District Court entered a decree dismissing the bill of complaint, with costs, and ordering judgment in favor of defendant and against plaintiff on the counterclaim for $54,185, with costs.

At the outset of the case, the District Court pointed out to counsel that the counterclaim was an action at law. As said by the District Court:

"Nevertheless, both sides have gone on, taken testimony, argued the matter, and neither in pleadings, nor during the taking of testimony, or at the close thereof, has any effort been made to get the counterclaim out of the case."

The court then proceeded to consider the counterclaim, and determined the issue in favor of defendant, as above stated.

[22] Plaintiff appealed from the final decree, and also took a writ of error to the judgment on the counterclaim. In respect of the writ of error, no bill of exceptions was settled, allowed, or filed, and no assignments of error, as required by rule 10 of this court (235 Fed. vi, 148 C. C. A. vi), were filed. The writ of error was thus improvidently allowed, and must be dismissed. Nevertheless, and laying aside this

point of procedure, we have examined the entire record, and for the purposes of this case only we have considered the record as if it brought up on review the whole case on an appeal from a decree in equity.

After such review, we are satisfied that the conclusions of the District Court on the facts and as to the law were right, and, as the District Court in a careful and full opinion set forth adequately both the questions of fact and law presented to it, we 'see no occasion for further discussion.

The decree is affirmed, with costs, and the writ of error is dismissed, without costs.