MASSACHUSETTS BONDING & INSURANCE COMPANY, APPELLEE, V. MASTER LABORATORIES, INC., APPELLANT.

10 N. W. (2d) 501

FILED JULY 13, 1943. No. 31591.

*Reed, Ramacciotti & Hruska,* for appellant.

*Kennedy, Holland, Delacy & Svoboda* and *Edwin Cassem,* contra.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

MESSMORE, J.

This law action was commenced in the municipal court on a special indemnity agreement, appealed to the district court by defendant where the action was, by agreement, tried on the same pleadings to the court. The court found generally in favor of the plaintiff and entered judgment for it in the sum of $1,000, from which the defendant appeals.

Plaintiff's petition alleged that on or about September 20, 1934, plaintiff issued a "Release of Garnishment" bond to Crazy Crystals Company of Minnesota in the amount of $1,500, to secure liability of $750; that said bond was filed in the circuit court of Ramsey county, Minnesota, in a case entitled "Minnesota Broadcasting Corporation v. Crazy Crystals Company of Minnesota;" that to secure the plaintiff the defendant entered into a special indemnity agreement as follows: "Whereas, the said Massachusetts Bonding and Insurance Company has become or is about to become surety, at the request of the undersigned on the bond above described, the undersigned, in consideration thereof, hereby agree to indemnify and keep the Massachusetts Bonding and Insurance Company indemnified and hold and save it harmless from and against any and all demands, liabilities, charges and expenses of whatsoever kind or nature, which it may at any time sustain or incur by reason of or in consequence of having executed the above described bond, and ——————— do further guarantee that the charges for executing and continuing upon the bond will be paid as agreed until the Company has been released from liability thereunder;" that it was attached to and made a part of the

Crazy Crystals Company's application for the bond; alleged further that the plaintiff was forced to pay Minnesota Broadcasting Corporation on August 27, 1936, the sum of $889 under said bond and the additional amount of $62.55 as expense, making a total loss of $951.55 under the bond for which amount, with costs, plaintiff prayed judgment.

The defendant's answer contained a general denial; alleged that neither the defendant nor any one purporting to obligate it signed any special indemnity agreement on the date of or before the bond was executed or became binding upon the plaintiff; alleged that any agreement purported to have been executed by defendant was without valid or sufficient legal consideration; also, that John E. von Dorn was never, in fact, authorized to bind defendant by the execution of any such agreement, and the alleged execution thereof was *ultra vires* and without authority or direction on behalf of the defendant and outside the power or right of von Dorn to bind it and unenforceable as to this defendant; further alleged that if any one, purporting to bind defendant in connection with the issuance of the bond prior thereto, plaintiff, through its agent, Harry A. Koch Company, assured and agreed with defendant that any such agreement would not be relied on or enforced by plaintiff, and that if such agreement should be executed by defendant the same would merely be an accommodation to the agent of plaintiff (Koch), to be retained in the files of such agent only until the prior indemnity agreement, executed by other parties, should be located or a new one obtained from said third party; that the indemnity agreement was, after the time of its execution, materially altered, and that S. Z. Alpirn never witnessed any signature of von Dorn in connection with any alleged agreement executed by him in connection with the bond; prayed for a dismissal of the plaintiff's petition.

Plaintiff's reply reaffirmed the allegations of the petition; alleged that at the time of the execution of the bond the Crazy Crystals Company of Minnesota and Master Laboratories, Inc., were corporations, both wholly owned and controlled by William C. Kalash, either directly or through

the medium of holding companies, wholly owned and controlled by Kalash; that in obtaining the bond Kalash, through his corporations, represented and promised that said indemnity would be provided; that after the bond had been executed Kalash stalled and evaded his obligation for a long period of time and ultimately caused his wholly owned and controlled corporation, the defendant, to execute the indemnity agreement; that the defendant and Crazy Crystals Company of Minnesota were but the alter ego of William C. Kalash and used by him to perpetrate a fraud upon the plaintiff and to hinder, delay and defraud creditors; that defendant, acting as the alter ego of Kalash and Crazy Crystals Company of Minnesota, paid the premium on the bond after the execution of said indemnity agreement, ratified and made payment of $100 upon the liability incurred by defendant under the indemnity agreement, and defendant, acting as the alter ego of William C. Kalash and his various corporate disguises, promised to make further payments under the indemnity agreement. The reply further alleged that the whole course of dealing by the Crazy Crystals Company of Minnesota, the defendant and Kalash was, in fact, one in which Kalash sought to use the corporate forms as a means of hindering, delaying and defrauding the plaintiff. Further answering, plaintiff denied each and every allegation in the answer not admitted or affirmed by the petition or reply.

The record discloses that on September 20, 1934, Master Laboratories, Inc., by telephone to the Harry A. Koch Company, a general insurance and bonding company, requested it to procure a release of garnishment bond for the Crazy Crystals Company of Minnesota, involved in litigation with the Minnesota Broadcasting Corporation. The Koch company telephoned insurance and bond agents in Minneapolis to write the bond, and on the same day dispatched a telegram to Twin City Insurance Agency of Minneapolis as follows: "Please get in touch with Attorney George Jansen, First National Bank Building St. Paul executing fifteen hundred dollar release garnishment bond Crazy Crys-

tals Company of Minnesota. Have requested Home Office wire you today sure authorizing this bond." On the same day a telegram was sent by the Koch company to the plaintiff, requesting it to authorize Minneapolis agents to execute release of garnishment bond for Crazy Crystals Company of Minnesota, "to be indemnified by its owner personally Mr. W. C. Kalash who is worth upwards of two hundred thousand dollars with no debts or obligations," and stating that Kalash was "perfectly safe and large clients of this office. * * * Minneapolis office must have this authorization today." On September 21, 1934, plaintiff telegraphed the Koch company that it must have the customary collateral before authorizing the bond, and a letter written by plaintiff to Koch company, dated September 22, 1934, contained the same requirement. At the time of issuing the bond the Koch company did not procure an application or collateral security, due to the fact that it was its customary practice, in furnishing bonds needed in an emergency, for some of its clientele, to forego a written application at the time. Up to October 9, 1934, no application had been received, and Harry A. Koch, president of the Koch company, delivered an application in person to the defendant which was lost; subsequently, other sets of applications were taken to the defendant's office, not signed or returned.

W. C. Kalash promoted and set up the following corporarations: Master Laboratories, Inc., Master Drugs, Inc., Crazy Crystals Company of Minneapolis, Michigan, Nebraska, Inc., and the Crazy Crystals Company of Canada, Ltd., and W. C. Kalash, Inc., the latter organized subsequent to the others as a holding company for the capital stock of the other corporations. Kalash owned the stock in W. C. Kalash, Inc. The corporations were operated by Kalash from one office at Twenty-seventh and N streets, in Omaha, and all correspondence and business transactions involving the corporations were from this location. Koch had transacted business with Kalash and the different corporations at the same location, having known Kalash since 1920. In 1929 von Dorn, an attorney, came into the Kalash organi-

zations and became "right-hand man" of Kalash, and Koch had transacted business with him for the various organizations, which included insurance on public liability, compensation and fire.

On October 9, 1934, the Koch company wrote Kalash concerning the application, requesting him to sign and return it, and stating that the bond was recommended on Kalash's personal responsibility; that if the bond was to "stick" there should be a financial statement, and, even with it, there should be collateral which Koch hoped to have waived if Kalash's statement would justify such course. Previously, the Koch company had obtained a general indemnity agreement with the different corporations, signed by Kalash, and business was transacted by the parties, relying on this agreement. Whether or not such general indemnity agreement covered the Crazy Crystals Company of Minneapolis was not definite. In any event, such indemnity agreement did not appear in this lawsuit. The final analysis of Koch was that it had been attached to some bond and sent to the principal office of plaintiff. It was not found. The application for the bond was not obtained, nor the premium collected, nor the bond reported to the plaintiff by the Koch company.

In 1936 the plaintiff informed the Koch company that it had been called upon to pay the liability created under the bond and desired an explanation, requesting Koch to have his clients pay the judgment. There are several exhibits in the record, which we shall not enumerate, wherein Koch urged plaintiff to institute suit against Kalash to recover the amount plaintiff had paid on the judgment and expenses. Finally, the Koch company obtained an application, signed by von Dorn as vice-president of the Crazy Crystals Company of Minnesota, and the special indemnity agreement, sued on and set forth in the pleadings, by Master Laboratories, Inc., by John E. von Dorn, Secretary. The witness to the instruments was S. Z. Alpirn, private secretary of Mr. Koch and head of the bond department.

While the special indemnity agreement was procured in

the early fall of 1936, together with the application, the instrument was dated back to the date of issuance of the bond, when it was returned to the Koch company office, and S. Z. Alpirn signed as a witness to the signature of von Dorn, he not being present. Correspondence then took place between Koch and the plaintiff with reference to procuring the application and special indemnity agreement. As to obtaining the special indemnity agreement, the testimony of Koch and von Dorn is at variance. The latter, at the time of signing the instrument, informed Koch that he did not know whether his execution of the instrument would be "any good," as the Crazy Crystals Company of Minnesota had either gone into bankruptcy or been dissolved. Koch testified that he relied upon the signature of von Dorn and that it was "good enough" for him. A letter from Master Laboratories, Inc., signed by John E. von Dorn, Secretary, dated September 24, 1936, to the Harry A. Koch Company reads as follows:

"As the bonding company has paid this bond in this matter and we have a liability to pay the correct amount which has not as yet been determined in full, and as it is quite a load to pay at this time we are enclosing our check in the amount of $100 and will attempt to make these payments each week until the matter is straightened out.

"We would like to have a complete itemized statement of the amount that the bonding company claims is due so that this may be settled between us.

"You may expect our check weekly as per this letter." No further payment was made.

In the corporations previously mentioned Kalash held the principal offices, generally president, and issued a qualifying share of stock to von Dorn, with one exception, when the amount of $100 was paid by von Dorn, or credited to him, for one share of stock in Master Laboratories, Inc. Stock in such corporations was held by Kalash, Mrs. Kalash or W. C. Kalash, Inc. It is apparent from the record that in all of such corporations, with reference to the ownership of stock, management and business transactions, Kalash was the

prime and moving factor and that von Dorn acted only upon Kalash's suggestions and advice. In 1932 von Dorn became vice-president of Master Laboratories and later secretary. When the latter company was known as Master Drugs, he was secretary. Kalash was president of Master Laboratories, Inc., in 1929 and became the sole owner in 1931, continuing as president. He was president of Master Drugs, von Dorn secretary, holding a qualifying share, actually owned by Kalash, Mrs. Kalash, or W. C. Kalash, Inc. von Dorn was vice-president of the Crazy Crystals Company of Minnesota; Kalash president. von Dorn owned no stock in that company, merely a qualifying share. He was likewise vice-president and an officer in other Crazy Crystals organizations as before designated. At the time of the trial von Dorn was president and treasurer of Master Laboratories, Inc. Kalash had obtained a contract with a company in Texas, for distribution rights of its product (Crazy Crystals) in various states, which he assigned to the different corporations selling the product, owned and controlled by him. von Dorn devoted a substantial part of his time to the management and promotion of the Crazy Crystals Company of Minnesota and other such companies, being employed by Kalash.

Subsequent to 1934, and, as near as can be ascertained from the record, in April, 1935, Kalash transferred his stock ownership in Master Laboratories to W. C. Kalash, Inc., and Master Drugs, Inc., was formed in 1935 or 1936. When the application for the bond was being sought, Koch was not able to find Kalash at his place of business, as he was generally out of the city. On one occasion he did find him, and Kalash would do nothing about the matter because von Dorn was absent from the city. In August, 1936, von Dorn informed Kalash that Koch had been down to the office and had stated that the bonding company had been compelled to pay the judgment obtained against the Crazy Crystals Company of Minnesota; that Koch was "in bad shape," needed the application for his files, and that he had told Koch that his (von Dorn's) signature on the indemnity

agreement "wasn't any good" at the time he signed it. Kalash asked him if it was true, and von Dorn said "yes," to which Kalash replied, "that was fine, or words to that effect."

Referring to the letter, heretofore set out, under date of September 24, 1936, when the 60-dollar premium on the bond was paid and the 100-dollar payment made, Kalash told von Dorn to send such amount and charge the same to him. von Dorn testified there was no business connection between Master Laboratories, Inc., and the Crazy Crystals companies in September, 1934, and that the last time W. C. Kalash personally, W. C. Kalash, Inc., or Mrs. Kalash had any interest in Master Laboratories was June 4, 1937. Shortly thereafter Kalash became a permanent resident of California.

Other exhibits appear in the record,—a letter written by Koch to plaintiff, dated February 3, 1938, wherein he stated he was pleased "to enclose the original application which we thought had been forwarded to you but which now develops was all the while contained in our file;" a letter, dated July 29, 1937, from Koch to Kalash, informing him that he, Kalash, had signed a general indemnity agreement; other correspondence between the Koch company and plaintiff with reference to the liability of Kalash on the indemnity and the liability of this defendant, expressing the thoughts of Koch and the plaintiff on such matter, and an endeavor of Koch to induce Kalash to reimburse the plaintiff. These exhibits we will not detail. The foregoing constitutes the substance of the material evidence in the case.

The defendant contends that the court erred in not sustaining the defense of lack of valid or sufficient consideration as to it. In this connection, defendant states the bond was issued without an application, on sole reliance of the personal indemnity agreement executed by Kalash. Plaintiff had no knowledge of the existence of the bond; that its agent wrongfully procured the bond, contrary to the plaintiff's instructions; consequently, the plaintiff did not reply on anything when the bond was issued, and its agent, the

Koch company, relied on the personal indemnity agreement of Kalash; that the indemnity agreement sued on was never signed by the defendant until the plaintiff was irrevocably liable on the release of garnishment bond; therefore, no loss was suffered by plaintiff through the defendant's acts; that defendant was not interested in the bond; no benefit accrued to it and it had no business interest in the Crazy Crystals Company of Minnesota, or in its product, for which the bond was issued.

While many cases are cited by the defendant, the law announced therein is covered in 31 C. J. 424, on "Indemnity," wherein it was said: "The general rule that a past consideration, if it imposed no legal obligation at the time it was furnished, will support no promise whatever, has been held applicable to contracts of indemnity. In accordance with such rule the incurring of liability or the performance of an act is not valid and sufficient consideration for a subsequent contract of indemnity against the consequences of such liability or act, and such a contract is invalid for want of consideration, unless it is made in pursuance of an arrangement or agreement between the indemnitor and indemnitee entered into before or at the time such liability was incurred or such act was performed, or the consideration is of a continuing nature, or the subsequent promise of indemnity is coupled with a precedent instance or request, or unless a new consideration is given for the indemnity." And defendant also contends that all plaintiff did in the instant case, when it paid off on the bond, was to perform an existing legal obligation, citing: "Mere performance of an existing legal obligation is no consideration." 31 C. J. 422.

Without repeating or summarizing the evidence, we conclude that the following authorities are applicable:

Anderson, Limitations of the Corporate Entity, states (p. 252, sec. 247): "It is now so well established that it has become almost aphoristic that, upon a proper showing that a corporation is but an instrumentality through which its owner or substantial owners for convenience transacts or transact his or their business, by the great weight of au-

thority, both equity and law will look through the form to its substance and will hold such corporation bound as the owner of the corporation might be bound or conversely hold the owner bound by acts which bind his corporation. And so, where an individual owns all of the stock of a corporation or substantially so, and that the corporation is in truth and in fact, but the juristic double of its owner and where fraud or injustice will likely operate to the injury of third persons, this situation suffices to dissipate the separate fictional identity of the corporation and the law will have no compunction in holding the corporation liable for the acts of its owners or *vice versa*. And this rule is the same though the stock of the corporation is owned by two or more who act in conjunction with the corporate organization."

Defendant contends, however, that, in the event this rule is applied, the liability would be the personal liability of Kalash for which he had given his personal indemnity, and still not the liability of the defendant upon the indemnity agreement sued on. With this technical objection we are not in accord. The transaction is still the transaction of all the parties. Kalash acquiesced in the act of his principal agent, adviser and confidant, who executed the indemnity agreement sued on. Kalash's instructions were to pay the premium, pay the obligation and direct the manner in which it should be paid.

In *United States v. Milwaukee Refrigerator Transit Co.*, 142 Fed. 247, it was said (p. 255): "If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." See, also, *Wenban Estate, Inc., v. Hewlett*, 193 Cal. 675, 227 Pac. 723; *Ehlers v. Bankers Fire Ins. Co.*, 108 Neb. 756, 189 N. W. 159.

The supreme court of the United States has laid down the rule which has the sanction of the authorities generally,

that, where the difference between corporations is reduced to mere matter of bookkeeping, such corporations cease to have separate legal entities and will, in the interest of justice, be treated as one. Anderson, Limitations of the Corporate Entity, p. 310, sec. 316.

We hold that the defense of lack of consideration is without merit. In view of our holding the defense of *ultra vires* falls, and the following statement of law is pertinent to such defense when applied to the instant case:

"The plea should not, as a general rule, prevail whether interposed for or against the corporation, where it will not advance justice but on the contrary will accomplish a legal wrong. So, the defense cannot be set up against a liability founded on fraud, and regardless of rights as between the parties in *pari delicto,* no immunity is acquired by the defense to the prejudice of innocent third persons." 19 C. J. S. 425, sec. 970.

We are in accord with the finding that the special indemnity agreement was not executed as an accommodation to the Harry A. Koch Company. The act of the Koch company in failing to forward the premium or report the bond to plaintiff, or to act in accordance with plaintiff's instructions, is a matter solely related to the Koch company and the plaintiff. The plaintiff was an innocent party, acted in good faith and paid its obligation when it learned of its liability, and, under the facts and circumstances and the law applicable thereto, should not be penalized.

For the reasons given in this opinion, the judgment of the trial court is affirmed.

AFFIRMED.

YEAGER, J., not participating.