RAY RIDENOUR AND FAYE RIDENOUR, APPELLEES, v. ADOLPH KUKER, APPELLANT, CONSOLIDATED WITH FAYE RIDENOUR, APPELLEE, v. KUKER INDUSTRIES, INC., A CORPORATION, APPELLANT, CONSOLIDATED WITH RAY RIDENOUR, APPELLEE, v. ADOLPH KUKER AND KUKER INDUSTRIES, INC., A CORPORATION, APPELLANTS.

175 N. W. 2d 287

Filed March 13, 1970. No. 37377.

Frank B. Morrison, Sr., of Morrison & Morrison, and Eisenstatt, Morrison, Higgins, Miller, Kinnamon & Morrison, for appellants.

Nelson, Harding, Marchetti, Leonard & Tate, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

BOSLAUGH, J.

These cases arise out of oral contracts which the plaintiffs allege were made with the defendants in 1964. The cases were originally commenced as one action but were separately docketed after a demurrer for misjoinder was sustained. They were consolidated for trial in the district court and were briefed and argued together in this court. Since the cases arise out of one transaction, the three appeals will be disposed of in this opinion.

The record shows that Kuker Industries, Inc., is a corporation engaged in the manufacture of agricultural sprayers. Faye E. Ridenour was employed by the corporation as a bookkeeper commencing January 2, 1964. Prior to April 6, 1964, the outstanding stock of the corporation was owned equally by Adolph Kuker and Paul

Kuker, his brother. Paul Kuker had charge of the factory and its management and Adolph was the sales manager.

On April 6, 1964, Adolph purchased Paul's stock for $38,000 and Paul withdrew from the business. At closing time Adolph asked Faye if she or her husband, Ray Ridenour, would like to meet with Adolph and his wife at the plant that evening. Faye told Adolph that she and Ray would be there.

The plaintiffs met with Adolph and his wife at the plant at about 8 p.m. Adolph showed them around the plant and then discussed the matter of the plaintiffs buying into the corporation and Ray taking charge of the plant. According to the plaintiffs, Adolph offered to sell the plaintiffs 25 percent of the stock in the corporation for $19,000. The plaintiffs explained that they only had $3,500 they could invest. Adolph then offered to "cover" their note for the balance. There was also discussion of job security and salaries. Adolph was to be president of the corporation and receive a salary of $1,000 per month. Ray was to be vice president in charge of purchasing and plant management at a salary of $800 per month plus $50 car allowance. Faye was to be secretary-treasurer and her salary was to be increased to $450 per month. It was also agreed that the plaintiffs would have their jobs as long as they had the stock in the corporation.

Adolph denies that he agreed to "cover" the plaintiffs' note for the balance due on the stock purchase. He testified that they were to secure the money by their own means.

Ray had been employed as parts manager and purchasing agent at the Omaha branch of the Fruehauf Trailer Company for 10 years and was earning approximately $1,000 per month. He explained that he would need to give Fruehauf 2 weeks' notice and could not start at Kuker Industries immediately.

On April 9, 1964, Ray went to the plant at the re-

quest of Adolph and placed a steel order. At that time Adolph asked Ray to come to work immediately. Ray then told Fruehauf that he could not stay the full 2 weeks and commenced work at Kuker Industries.

On or about April 10, 1964, Norman Kuker, a nephew of Adolph, came to Omaha and was at the plant on the following day. There was a conversation in which Adolph told the plaintiffs that Norman might buy 25 percent of the stock of the corporation, and Norman complained about the $50 per month car allowance that Ray was receiving. Apparently Norman was placed on the payroll at that time at $800 per month plus $50 car allowance.

On April 20, 1964, Adolph called a vice president of the North Side Bank and arranged for the plaintiffs to go to the bank to discuss a loan. The plaintiffs were not able to obtain the loan because of a lack of proper security. The plaintiffs then went to the First West Side Bank, where they maintained an account, and attempted to obtain a loan to purchase the stock from Adolph. In their presence an officer of the bank called Adolph and asked him if he would sign the plaintiffs' note. Adolph refused to sign the note.

The executive salaries at Kuker Industries were paid monthly on the last Friday of the month. On June 26, 1964, Faye made out the checks for Adolph, Norman, Ray, and herself. Adolph refused to sign the checks for the plaintiffs and ordered Faye to reduce Ray's check to $400 and her check to $300. Faye refused to change the checks. There was further conversation in regard to the checks on Saturday and the following Monday.

On Tuesday, June 30, 1964, Adolph called Ray into his office shortly after 5 p.m. and handed him a letter stating that he was discharged because he had failed to attend a meeting at the plant on the preceding Wednesday evening. Ray testified that he had talked with Norman Kuker by telephone after 5:30 p.m. on June 24, 1964, and that Norman had said that Adolph wanted to know if the plaintiffs could attend a meeting that eve-

ning. Ray said that they could not because they were having guests that evening. There is some conflict in the record as to whether Faye was discharged on June 30, 1964, but the plaintiffs' evidence is that both of them were discharged at that time.

In 1964 the plaintiffs commenced an action to recover damages resulting from the breach of the contract. A second action was filed in 1968 which resulted in these cases. The parties have referred to the suit for damages growing out of the stock purchase as case No. 1; the suit for wrongful discharge of Faye as case No. 2; and the suit for wrongful discharge of Ray as case No. 3.

The jury returned verdicts for the plaintiffs in all three cases and fixed the damages at $4,000 in case No. 1; $16,549.44 in case No. 2; and $35,919.75 in case no 3. The defendants' motions for new trials were overruled and they have appealed.

The evidence is in conflict, but the plaintiffs' evidence was clear, satisfactory, unequivocal, and sufficient, if believed, to sustain a finding that oral contracts were made between the plaintiffs and defendants as the plaintiffs contend.

There can be no question about the authority of Adolph to bind Kuker Industries, Inc., since on April 6, 1964, after the purchase of Paul Kuker's stock he was the sole stockholder and the only executive officer of the corporation. The three contracts resulted from one transaction in which Adolph participated in two capacities. In agreeing to sell a part of his stock to the plaintiffs he acted in his own capacity. In making the employment contracts he acted on behalf of the corporation.

The defendants argue that the corporation cannot be held liable in cases Nos. 2 and 3 because the plaintiffs never owned any stock in the corporation. Under the circumstances in these cases, the corporation cannot urge the result of Adolph's breach of contract in case No. 1 as a defense in the other cases. Adolph was the sole stockholder of the corporation at the time the con-

tracts were made and the corporate fiction may be disregarded when its retention would produce injustices and inequitable consequences. See Massachusetts Bonding & Ins. Co. v. Master Laboratories, Inc., 143 Neb. 617, 10 N. W. 2d 501.

The defendants urge that the contracts are not enforcible because of the statute of frauds. Generally, the statute does not apply where the contract has been performed by one party. Platte County Independent Telephone Co. v. Leigh Independent Telephone Co., 80 Neb. 41, 113 N. W. 799. The contracts involved in these cases all arose out of one transaction and were, in reality, but one contract so that the performance of each was referable solely to the others. In this case, the contract was fully performed by the plaintiffs to the extent possible, and full performance on their part was prevented by the refusal of Adolph to "cover their note" for the purchase of the stock.

There is another consideration, however, which prevents the judgments in these cases from being affirmed. Damages are recoverable for losses caused by breach of contract only to the extent that the evidence affords a sufficient basis of ascertaining their amount in money with reasonable certainty. Bitler v. Terri Lee, Inc., 163 Neb. 833, 81 N. W. 2d 318.

In case No. 1 the plaintiffs alleged that the stock for which they agreed to pay $19,000 had a value of $25,000. The verdict of the jury, in the amount of $4,000, had the effect of fixing its value at $23,000.

The plaintiffs introduced audit reports for the calendar years 1963 and 1964. These reports show that the corporation had a loss, before tax refunds, of $11,-878.76 in 1963 and $30,504.44 in 1964. The par value of the stock is $50 per share. The book value per share at the end of 1963 was $60.97, and at the end of 1964, $44.31. The plaintiffs agreed to pay $54.39 per share which was the price Adolph paid when he purchased his brother's stock that same day. The evidence will not

sustain a finding that 25 percent of the stock of Kuker Industries had a value of $23,000, or $65.71 per share, on April 6, 1964, as fixed by the jury.

In case No. 2 the jury returned a verdict of $16,549.44. The measure of damages in a suit for breach of contract for personal services is the amount of the salary agreed upon for the period involved less the amount which the servant earned or, with reasonable diligence, might have earned from other employment during that period. Lee v. Ralston School Dist., 180 Neb. 784, 145 N. W. 2d 919.

The evidence shows that the plaintiffs received unemployment compensation and reported to the Nebraska Employment Service until November 1964 when they purchased a motel in Ponca City, Oklahoma. They operated the motel until October 1967 and then returned to Omaha. Faye accepted employment in Omaha in January 1968 at $475 per month.

During 35 of the 42 months from July 1964 to January 1968, the plaintiffs were in the motel business. The authorities are in conflict as to how self-employment should be treated with regard to mitigation of damages in an action for breach of an employment contract. We believe that the better rule is that the value of the employee's services while engaged in self-employment must be considered in determining the loss resulting from the breach of contract. See 56 C. J. S., Master and Servant, § 59, p. 472.

Here the contracts of employment were for an indefinite term, as long as the plaintiffs owned the stock. It was not a hiring at will because the plaintiffs had agreed to purchase stock in the corporation which was a consideration additional to the services to be performed. Where the contract of employment is for an indefinite term, but is not a hiring at will, an employee is entitled to a reasonable time, to be determined from all of the facts and circumstances, in which to find other employment or go into business for himself. See Ransome

Concrete Machinery Co. v. Moody, 282 F. 29. Under the circumstances in this case we conclude that an award of salary for more than 36 months in case No. 2 is not sustained by the evidence.

In case No. 3 the jury returned a verdict for $35,919.75. The evidence shows that Ray, the plaintiff in case No. 3, obtained no employment, other than the operation of the motel in Ponca City, Oklahoma, until March 1968.

The verdict of the jury in case No. 3 is equivalent to Ray's full salary for more than 44 months. Under the circumstances of this case, and for the reasons previously stated, we conclude that this award is not sustained by the evidence.

The judgment in case No. 1 is reversed and the cause remanded with directions to dismiss the action. The judgments in cases Nos. 2 and 3 are reversed and the causes remanded to the district court for a new trial in each case on the issue of damages.

CASE No. 1 REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS THE ACTION. CASES Nos. 2 AND 3 REVERSED AND REMANDED FOR NEW TRIALS ON THE ISSUE OF DAMAGES.