ALIS DUDDEN BELLAIRS, CHRISTINE DUDDEN ROSENBACH, BERDENA DUDDEN SATTLER, AND RAYMOND L. DUDDEN, APPELLEES, v. RICHARD A. DUDDEN AND JOAN M. DUDDEN, HUSBAND AND WIFE; BRENT A. DUDDEN; PERRY L. DUDDEN AND DONNA R. DUDDEN, HUSBAND AND WIFE; TODD A. DUDDEN; GARRETT B. DUDDEN AND MARTHA JANE DUDDEN, HUSBAND AND WIFE; AND DUDDEN ELEVATOR, INC., A CORPORATION, APPELLANTS.

230 N. W. 2d 92

Filed May 29, 1975. No. 39655.

Bernard B. Smith and William S. Padley, for appellants.

Martin, Mattoon & Matzke and Maupin, Dent, Kay, Satterfield, Girard & Scritsmier, for appellees.

Heard before WHITE, C. J., BOSLAUGH, McCOWN, and NEWTON, JJ., and STUART, District Judge.

STUART, District Judge.

The plaintiffs brought suit praying that the defendants be adjudged to be constructive trustees for certain debenture notes issued by Dudden Elevator, Inc. After trial to the court, judgment was entered that the debenture notes, or duplicates of such debentures, be returned to the plaintiffs and that such notes would be obligations of the defendant, Dudden Elevator, Inc., according to their terms. From that judgment the defendants appeal to this court.

A suit to enforce a constructive trust is an equitable action. Upon appeal we shall consider the record de novo. Peterson v. Massey, 155 Neb. 829, 53 N. W. 2d 912. Scholting v. Scholting, 183 Neb. 850, 164 N. W. 2d 918.

Barney A. Dudden and his first wife, Belle, had six children, Garrett B. Dudden, Alis Dudden Bellairs, Berdena Dudden Sattler, Orville Dudden, Raymond Dudden, and Christine Dudden Rosenbach. Garrett B. Dudden married Martha Jane, to which union were born two children, Richard A. Dudden and Perry L. Dudden. Richard A. Dudden married Joan M., to which union was born one child, Brent A. Dudden. Perry L. Dudden married Donna R., and to this union was born one child, Todd A. Dudden. For convenience the parties to this action will be referred to by their first names.

Barney engaged in wheat farming near Venango, Nebraska, and in 1927 purchased a grain elevator in Venango. In 1940 Garrett purchased a grain elevator in Venango and Garrett and Barney formed a partnership operating these two elevators. From that time until his death as a result of an automobile accident in July 1969, Barney and his son Garrett were very close in that they engaged in a common business, saw each other almost every day, and at all times shared an office in the elevator building. In 1951 the business was incorporated as Dudden Elevator, Inc. Belle and Martha Jane each received one share of stock and the rest of the stock was issued to Barney and Garrett in equal shares. Bar-

ney was designated as president of the corporation and served as such until shortly before his death. The two men divided their duties in that Garrett ran the elevator and Barney ran the farming operation. Other members of the Dudden family participated in this business, but none in management positions. Both these operations were very profitable and, as money was made, additional farms were purchased and six substantial concrete additions to the elevator were built in 1951, 1952, 1953, 1954, 1958, and 1959, with a total storage capacity of 2,500,000 bushels and at a cost of almost one million dollars. All the members of the Dudden family agree that this family business was dominated and controlled by Barney until his death. With advancing age Barney began to divest himself of property, and gave each of his children over 2,000 acres of land, except Garrett, who sometimes received shares of stock in the elevator rather than land. Barney also made substantial gifts to his grandchildren. As he had divested himself of the land, Barney also began to divest himself of the stock in the elevator and at the time of his death was only a minor stockholder. Besides divesting himself of most of his elevator stock, he also gave his children debenture notes payable by Dudden Elevator, Inc., as follows:

> December 1, 1957 - $6,000
> December 1, 1958 - $6,000
> December 1, 1964 - $5,000
> January 4, 1965 - $5,000

These debentures were all payable 10 years after their issuance. Since there were six children, this debt totaled $132,000.

In a period from 1960 to 1964 Alis, Berdena, Orville, Raymond, and Christine sold their stock in Dudden Elevator, Inc., to the Elevator, or to Garrett and his sons, daughters-in-law, and grandchildren.

Richard was graduated from law school in March of 1964 and began to practice law shortly thereafter, main-

taining a law office in Denver. Richard testified that he first became a stockholder in Dudden Elevator, Inc., on May 5, 1956, upon his graduation from high school and that he began to acquire further shares of stock in 1960 and acquired shares each year thereafter until 1968. Similar acquisitions of stock were made by Perry and the wives and children of these men so that on January 6, 1968, the stockholders of Dudden Elevator, Inc., were as follows:

| | |
|---|---|
| Richard | 239 shares |
| Perry | 238 shares |
| Todd | 61 shares |
| Brent | 61 shares |
| Donna | 60 shares |
| Joan | 60 shares |
| Garrett | 46 shares |
| Howard M. Hunter | 7 shares |
| Martha Jane | 6 shares |
| Barney | 2 shares |

As noted above the business was very profitable until the middle 1960's. Beginning about 1965, the federal government terminated its plan of paying local elevators for the storage of grain. This change of policy resulted in the Dudden Elevator, Inc., losing most of its grain storage, which was a substantial portion of its business. As a result the Dudden Elevator, Inc., suffered operating losses as follows:

Fiscal year ending in 1965 - $160,166.88
Fiscal year ending in 1966 - $125,131.67
Fiscal year ending in 1967 - $ 31,804.02

In addition, the first series of debenture notes became payable on December 1, 1967. During the latter part of 1967 Barney became convinced that Dudden Elevator, Inc., was in danger of financial failure and, although he was no longer a young man, the undisputed evidence is that he retained his mental vigor and acumen through this period and even until his accidental death. After consultation with Garrett and Richard, Barney instructed

Richard to call a meeting of the Dudden family in Richard's law office in Denver, on January 6, 1968. The events that occurred at this meeting led to this lawsuit, and it will hereafter be referred to as "the meeting." The meeting was called for the purpose of securing the return of the debenture notes. Richard prepared for the meeting by drafting statements of corporate conditions from figures furnished primarily by Howard M. Hunter who kept the books for Dudden Elevator, Inc. In addition, Richard consulted William T. Diss, a Denver C.P.A., regarding the tax consequences of the proposed transactions, and with the assistance of Mr. Diss prepared assignments of the debenture notes and other related documents.

Prior to the meeting Barney visited with some of his children regarding the proposed transactions. He expressed a great concern for the condition of Dudden Elevator, Inc., and stated that he did not want the elevator to fail during his lifetime. He made it known that he wanted the notes "cancelled off the books" of the elevator in order that it might be saved. He was much more emotional about the proposed transactions than was his custom, but there is no claim that he was other than totally competent. The meeting was attended by Barney; his children Alis, Berdena, Orville, Raymond, and Christine; his grandson, Richard; and Mrs. Laurent, a daughter of Barney's second wife. Garrett was not to be present "to save him embarrassment." The meeting was opened by Richard who presented documents regarding the financial condition of Dudden Elevator, Inc., and made certain explanations as to their contents. Assignments of the notes were presented and explained. Richard was then dismissed by Barney, and Barney then presided at the meeting. Barney again stated that he wanted the debenture notes canceled off the books and that it was his opinion that Dudden Elevator, Inc., was on very shaky financial grounds. He asked his children to reassign the debentures because "the ele-

vator was going under, and this was one of his babies
* * * and he didn't want it to go under and by turning
these debenture notes back it would help alleviate the
financial situation." Richard was then called back into
the meeting and the assignments were executed to ef-
fectuate the plan. The debentures were transferred to
Barney, as trustee, and he then reissued debentures in
the same total amount payable to the following persons:

| | |
|---|---|
| Richard | 30.641% |
| Perry | 30.514% |
| Todd | 7.821% |
| Brent | 7.821% |
| Donna | 7.692% |
| Joan | 7.692% |
| Garrett | 5.897% |
| Howard M. Hunter | .897% |
| Martha Jane | .769% |
| Barney | .256% |

It should be noted that the debentures were issued to
the stockholders of the corporation in the same ratio as
they held stock. This transfer involved $126,000 worth
of debentures rather than $132,000 since Berdena had
previously been paid $6,000 on the debenture issued to
her December 1, 1957.

At the meeting an "Analysis of Profits and Losses"
was presented showing the corporate profits and losses
for the years 1962 to 1967. There was also presented a
"Stockholders' Deposits Accumulated" in which the debit
and credit balances of various stockholders were set
forth. These reports were accurate and no complaint
is made with reference to them. However, there was
also presented an "Analysis of Assets and Liabilities"
which the plaintiffs assert omitted current assets, listed
current liabilities twice, and omitted other assets so that
the financial condition of the corporation was made to
appear much worse than it actually was. The trial
court correctly found that Dudden Elevator, Inc.,
was in a much better financial position than por-

trayed by this "Analysis of Assets and Liabilities" that was prepared for and presented at the meeting.

On January 19, 1971, Alis, Cristine, Berdena, and Raymond demanded a reconveyance to them of these debentures by a written notice to defendants, and thereafter on October 22, 1971, filed a petition for their return in the District Court for Perkins County. Orville did not join in this demand nor in the following legal action.

The plaintiffs contend that Richard occupied a fiduciary capacity since he had in the past done legal work for some of his aunts and uncles. In that connection the evidence shows that Alis had Richard incorporate her farm assets in 1964, prepare her will in 1966, and handle an irrigation well permit with the Colorado authorities in the fall of 1968 or the spring of 1969. Berdena had Richard incorporate her farm in 1964, draw her will in 1965, and he was advising with her in regard to the transfer of some stock in her farm corporation at the time of the meeting. Raymond was having Richard do legal work with regard to the sale of some houses in Venango at the time of the meeting. Christine had never employed Richard as an attorney. Richard had never represented any of the four plaintiffs in matters concerning the Dudden Elevator, Inc., nor in any capacity having to do with the business to be discussed at the meeting.

The duties of an attorney are set forth in the case of Adams v. Adams, 156 Neb. 778, 58 N. W. 2d 172, which states in part: "The fact than an attorney was incidentally connected with an adverse interest does not of itself disqualify him. He may act for a new client if his interest is not necessarily adverse to those of the former client, and if the attorney is not called upon to use or take advantage of the confidential communications of the former client for the benefit of the new one. The test of inconsistency is not whether the attorney has ever been retained by the party against whom he proposes to appear, but whether the acceptance of the new

retainer will make it necessary or convenient in advancing the cause of his new client to do anything which would injuriously affect his former client, and whether he will be obligated in the new relationship to use against his first client information received because of the former employment. An attorney is not barred from representing a subsequent client against a former client where the duties required of him do not conflict with those involved in the former employment." The trial court correctly found that Richard was guilty of no unprofessional conduct.

As stated by the trial court in his memorandum opinion: "The plaintiffs knew that what was being asked of them was adverse to their financial interests. The Court is convinced that the plaintiffs further knew that the Garrett B. Dudden family, and Richard Dudden himself, would be the principal beneficiaries of the transfer. Under those circumstances, they could not logically rely upon Richard Dudden as their attorney in the transaction, even though he had performed certain services for some of them in the past. This is * * * a case where his representation was clear and clearly adverse to plaintiffs. The plaintiffs did not rely, and could not rely, upon Richard Dudden as their attorney."

It is obvious that the plaintiffs knew that the family of Garrett had been accumulating stock for years and they also knew that none of the plaintiffs were then stockholders in the corporation. This, together with the absence of Garrett at the meeting "to save him embarrassment" and the dismissal of Richard from the room for the essential part of the meeting when Barney asked his children to assign the debentures certainly indicates that all concerned knew that the family of Garrett would be the principal beneficiary of the gifts about to be made. We find that there was no confidential or fidicuary relationship between Richard and the plaintiffs.

This then raises the question as to whether there was such misrepresentation of facts at the meeting that

plaintiffs would still be entitled to recover without the existence of such confidential or fidicuary relationship. Plaintiffs' petition prays that the defendants hold the debenture notes as constructive trustees for the plaintiffs. In order to have such constructive trust it is necessary to find that the debenture notes were obtained from plaintiffs by acts constituting fraud.

"The essential elements required to sustain an action for fraud are, generally speaking, that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage." Transportation Equipment Rentals, Inc. v. Mauk, 184 Neb. 309, 167 N. W. 2d 183. See, also, Buhrman v. International Harvester Co., 181 Neb. 633, 150 N. W. 2d 220; Campbell v. C & C Motor Co., 146 Neb. 721, 21 N. W. 2d 427.

The only "essential element" necessary to discuss is whether plaintiffs did in fact rely upon the untrue representations contained in the "Analysis of Assets and Liabilities." A further summary of the evidence is necessary. Alis testified that after Richard left the meeting, Barney told of the financial condition of the elevator; and he said he didn't want it to go under during his lifetime, that it would help if they would sign these debentures over, and that they would then have money to operate. She further admitted in her deposition that through the years she always complied with whatever her father directed or requested of her. She also said she realized it was her father's ability, effort, and good fortune that had made it possible for him to make substantial gifts to her. Her testimony included: "Q And that coupled with your respect for his judgment is why there was no hesitation on your part in meeting his request? A He asked for it and that's what we did." Berdena testified that she met her father the day before

the meeting and discussed with him the purpose of the meeting. Barney stated that her brother Garrett was in deep financial trouble and would need some assistance. She stated that at the meeting her father said the elevator needed assistance, and that he asked his children to reassign the notes to him so that the elevator would be free to borrow money to meet current obligations. Her testimony was that the situation was that her brother Garrett was in trouble and they were willing to help him. She admitted on cross-examination that she stated in her deposition she did not know whether the "Analysis of Assets and Liabilities" upon which the plaintiffs now base their claim of a misrepresentation was furnished to her at the time of the meeting. She stated she was satisfied to let her father work out the mechanics of this thing to do what had to be done, that she was perfectly willing that her father do what he could to help the elevator out of its financial difficulty, and that so far as she was concerned she never challenged or questioned any matters that Barney asked of her. Raymond testified that after Richard left the room at the meeting Barney said that he was very interested in having the debenture notes returned to him. He thought it would help save the elevator and put it on a profitable basis so that they could borrow money on it and that Barney was going to wipe them off the books. He stated that there was no dissent on the part of the children with regard to doing this and that, as a matter of fact, Barney's children were going to go along with what Barney wanted whether they liked it or not, or at least he was. He thought it was very possible that when the papers were handed out, irrespective of those papers, he was going to sign those debentures to his father when he asked; and he further admitted that he looked at the papers but he did not understand all of them. Christine testified that she met her father the day before the meeting in the coffee shop of the Auditorium Hotel in Denver and that Barney told her he wanted to

discuss these debenture notes, that she thought because of an earlier discussion with Garrett they were going to be extended and she just came right out and said, "I am perfectly happy to extend these notes. However, I think they should carry a little more interest." "Well," he said, "I set that interest up as a custom interest I have always paid, but I don't want them—they cannot be extended. I want you to return them to me." She told him at that time she would return them to him. She stated that after Richard left the room at the meeting, her father was a man who had real control of his emotions but he broke down a little bit; she stated that he asked them to return those notes because the elevator was in dire straights and unless this was canceled or removed from the books and no longer showed, the elevator could not borrow money; and that they desperately needed it and the elevator would go broke without return of those notes to him. With regard to assignments that were passed out at the meeting, Christine stated "I tried to look intelligent. I have never been able to read legal wording and at that time I didn't know what a Declaration of Trust was. But I trusted my Dad." With regard to the financial sheets which were distributed at the meeting, she stated "I don't understand the financial sheets; didn't really mean anything to me," and regarding the "Analysis of Assets and Liabilities" she said "I read them. I would say I didn't know what they meant." She stated that at the meeting she did exactly what she had told her father she would do when she met with him the day before.

The evidence here clearly shows that reliance was not placed upon any statements of financial conditions delivered to plaintiffs at the meeting, but that the four plaintiffs relied completely upon their father's judgment in stating that the debentures should be returned, and that they had always done what he asked them to do and they were going to do the same thing at this time. Each of these plaintiffs had been the recipients of very

substantial gifts from the father, who was an unusually successful businessman, and who had dominated the business transactions of his family all his life. It is natural to expect that when Barney wished his children to return the notes which amounted to a small fraction of his total gifts to them, they would comply. However, after Barney's death, a year and a half later, there was no longer this dominating influence over them, and they felt free to change their minds about the gifts to their brother, Garrett, and his family. Since reliance upon a misrepresentation is an essential element to sustain an action for fraud, the plaintiffs' case must fail.

Finally plaintiffs complain that they were not aware their father would receive the debenture notes as a trustee and would in turn reissue the debenture notes to the stockholders of Dudden Elevator, Inc. They argue they thought they would assign the notes to their father and the notes would then be "cancelled off the books." They further point out that when the debentures were issued that Barney's "Deposit Accumulated" with the elevator had been reduced and they now assume when he returned them to the elevator that his "Deposit Accumulated" would be raised. It must be pointed out this is only an assumption by the plaintiffs. No one even intimated that this would be the case. In fact, everything that was said to them indicated this would be a gift to Garrett and his family. There is one additional assumption which would have to be made before this would make any difference to the plaintiffs—that is, that they would receive part of this additional deposit at some later time, or upon Barney's death. Of course, children have no vested interest in their father's estate.

The reasons for handling the transaction as it was handled seem extremely logical. Mr. Diss, the C.P.A., advised that there could be several different tax liabilities arising from this transaction:

1. A possible gift tax payable by the note holders upon surrendering the obligations.

2. Possible income tax payable by Dudden Elevator, Inc., based upon satisfaction of a debt.

3. Possible additional estate tax payable by the Estate of Barney if these notes became his property.

4. Possible additional income tax payable by the stockholders of Dudden Elevator, Inc., since this corporation had previously elected to report under Sub Chapter "S" of the Internal Revenue Code.

Taking all these matters into consideration, Mr. Diss recommended that the note holders give their notes to the shareholders of the corporation through the medium of a dry trust with Barney as trustee. This was the action taken. It resulted in exactly the same effect as though the notes had been assigned to Barney and he had canceled them, except the tax consequences as outlined above. This argument of plaintiffs is obviously specious and deserves no further discussion.

The judgment of the District Court should be reversed, and the plaintiffs' petition should be dismissed.

REVERSED AND DISMISSED.