627 F.2d 129
 J-R GRAIN COMPANY, a Kansas Corporation, Appellant,
v.
FAC, INC., f/k/a Feaster Foods Agricultural Co., and Feaster
Foods Co., Nebraska Corporation; Richard S. Westin
and Douglas D. Leech, Individuals, Appellees.
 No. 79-1614.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 14, 1980.
Decided July 31, 1980.
 
 James B. Cavanagh (on brief), Erickson, Sederstrom, Leigh, Johnson, Koukol & Fortune, Omaha, Neb., for appellant.
 Eugene P. Welch (on brief), Gross, Welch, Vinardi, Kauffman, Day & Langdon, Omaha, Neb., for appellees; Thomas A. Greenan, Omaha, Neb., on brief.
 Before STEPHENSON, HENLEY and McMILLIAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 J-R Grain Co. appeals from a judgment entered in the district court[1] for the District of Nebraska finding, among other things, that FAC, Inc. (formerly known as Feaster Foods Agricultural Co.) breached a fertilizer supply contract with J-R Grain and awarding J-R Grain damages in the amount of $196,064.07 from FAC. In this appeal J-R Grain does not challenge the district court's finding of breach of contract or the amount of damages. J-R Grain does challenge the district court's failure to hold any of the other defendants[2] liable, particularly Richard S. Westin. As noted below, it appears that FAC has ceased to conduct business and has virtually no corporate assets.
 
 
 2
 For reversal J-R Grain argues that the district court erroneously failed to find that (1) Westin, Douglas D. Leech and Feaster Foods Co. had engaged in a conspiracy to defraud J-R Grain, (2) FAC was inadequately capitalized, and (3) Westin and Leech were liable as the directors of FAC for transferring without consideration the corporate assets of FAC to the newly incorporated D & D Commodity Co. For the reasons discussed below, we affirm the judgment of the district court.
 
 I. Facts[3]
 
 3
 In July, 1974, Douglas D. Leech, a former feed and grain broker, was interested in starting an agricultural fertilizer business and was looking for investment capital. Richard S. Westin, an Omaha businessman and president of Feaster Foods Co.,[4] was receptive to Leech's business idea and they incorporated Feaster Foods Agricultural Co. on July 26, 1974. Westin and his wife Diane each contributed $1,250 to the company; Leech was to have contributed $2,500 but never actually did so. Leech was president of Feaster Foods Agricultural Co. and in charge of its business operations. Westin was vice-president and also served as a management consultant. Feaster Foods Agricultural Co.'s business address was Suite 205, 4223 Center Street, Omaha, telephone 558-7400. The company's bookkeeping and secretarial work was performed by Feaster Foods Co. pursuant to a management agreement. Westin arranged a substantial line of credit (either $50,000 or $100,000) for Feaster Foods Agricultural Co. at the American National Bank in Omaha, secured by the company's inventory and accounts receivable and guaranteed by Westin and Feaster Foods Co. Feaster Foods Agricultural Co. then began buying and selling fertilizer and agricultural chemicals and was quite successful.
 
 
 4
 At a feed and grain association convention in Omaha, Nebraska, in January, 1975, Robert Maher, the manager of J-R Grain Co., a Kansas corporation engaged in the business of buying and selling grain and fertilizer, met Leech in one of the convention hospitality rooms. They exchanged business cards. Leech told Maher that he was a broker in the fertilizer business and was interested in buying fertilizer from him. Later Maher met Marty Shipporeit, a representative of Cargill Co., a large agricultural products company, and asked Shipporeit about Feaster Foods Agricultural Co. Shipporeit answered that "Feaster Foods" was a reputable and long established company which Cargill had dealt with in the past. As noted by the district court, Shipporeit had mistakenly believed Feaster Foods Agricultural Co. was Feaster Foods Co. Neither Maher or any other J-R Grain representative made any further inquiries about Feaster Foods Agricultural Co.
 
 
 5
 In February, 1975, J-R Grain had a chance to obtain some anhydrous ammonia fertilizer. There was a fertilizer shortage in 1974-1975; it was a seller's market during that time. Maher contacted Leech and offered to sell 2,500 tons of anhydrous ammonia fertilizer to Feaster Foods Agricultural Co. for $349 per ton plus shipping charges. Leech was interested; he checked with several possible buyers and entered into an oral agreement to sell the entire 2,500 tons to an Illinois farm supplier, Mid-States Supply Co., for $360 per ton. Leech then orally agreed to buy the 2,500 tons of fertilizer from J-R Grain.[5] The fertilizer was to be shipped at the rate of 600 tons per month, with shipping and destination instructions to be forwarded by Leech.
 
 
 6
 On February 18, 1978, Leech met Maher and Jimmie Dorman, the president of J-R Grain, in York, Nebraska to sign the contract. At this meeting Leech mentioned a few of his other business deals he was selling potash in New Mexico, his "partner" was the owner of a bacon bits factory and was negotiating the purchase of a dairy in Omaha, he had "a home" for the entire 2,500 tons of fertilizer, and he and his "partner" were interested in possibly handling the interim financing of the purchase of a boatload of fertilizer under consideration by an associate of Maher's. Maher had requested Leech to bring a financial statement of Feaster Foods Agricultural Co. to this meeting, but Leech did not do so nor did he later mail a copy to J-R Grain. Nonetheless, the contract was executed by Leech for Feaster Foods Agricultural Co. and by Maher and Dorman for J-R Grain without any verification of Feaster Foods Agricultural Co.'s financial condition.
 
 
 7
 In order to fulfill the contract, J-R Grain entered into supply contracts with BEC Transportation (1,000 tons at $336 per ton) and McCormick Grain (1,500 tons at $330 per ton). In March, 1975, Feaster Foods Agricultural Co. forwarded delivery instructions for four railroad carloads of fertilizer. Feaster Foods Agricultural Co. paid J-R Grain for these four carloads. A fifth carload was similarly shipped and payment was made. These five carloads accounted for approximately 405 tons of fertilizer.
 
 
 8
 In late March, the weather in Illinois was rainy; farmers were unable to apply the fertilizer. Mid-States Supply, confronted with reduced demand, refused to accept further shipments. Feaster Foods Agricultural Co. refused to forward additional shipping instructions to J-R Grain. In early April, Maher approached Leech with an option to cancel at no cost or to delay shipment of 700 of the remaining 2,095 tons of fertilizer. Leech refused both options and maintained that his obligation with Mid-States Supply was for the entire 2,500 tons.
 
 
 9
 In the interim, J-R Grain received more fertilizer from its suppliers and, without shipping instructions, shipped four more carloads of fertilizer to Feaster Foods Agricultural Co. in Omaha. Feaster Foods Agricultural Co. refused to pay for the four additional carloads. On April 22, Maher telephoned Leech but was unable to get in touch with him. Maher did speak with Westin, who invited Maher and Dorman to come to Omaha to speak with Leech about the contract. On the evening of April 23, Dorman, Maher and Leech discussed the contract; it became clear that Feaster Foods Agricultural Co. was in no position to perform its side of the bargain. Leech explained that his buyer (Mid-States Supply) refused to accept any more fertilizer. In addition, the market price for fertilizer was falling rapidly. On April 24, Westin met with Leech, Maher and Dorman. Later an employee of Feaster Foods Agricultural Co. sold one carload of fertilizer at below contract price; J-R Grain sold nine carloads (some carloads were in transit) at a private sale[6] at below contract price. J-R Grain also cancelled the balance of its supply contracts.
 
 
 10
 On April 27 or 28, Westin and Leech changed the name of Feaster Foods Agricultural Co. to FAC, Inc. FAC has conducted no business since May 4, 1975. On May 7, Westin and Leech incorporated a new company, D & D Commodity Co., to engage in the business of buying and selling fertilizers and agricultural chemicals.[7] Westin and Leech, as director of FAC, transferred without consideration an automobile and approximately $12,000 of inventory owned by FAC to D & D Commodity. This transfer left FAC with corporate assets consisting of less than $100 in a checking account. The current corporate status of both FAC and D & D Commodity is unclear.
 
 II. Litigation
 
 11
 J-R Grain then filed this action in federal district court. The basis for jurisdiction was diversity of citizenship. 28 U.S.C. § 1332. J-R Grain alleged that FAC breached its contract with J-R Grain; that Westin and Leech made fraudulent representations to J-R Grain about the financial condition of FAC; that Feaster Foods Co. and Westin fraudulently allowed FAC to use the name "Feaster Foods Agricultural Co." to mislead the public in general and J-R Grain in particular; that Westin, Leech, Feaster Foods Co. and FAC conspired to defraud J-R Grain by using FAC as a "shield" for speculation in the fertilizer market; and that FAC was inadequately capitalized by Westin and Leech, thus warranting the disregard of the corporate entity and the imposition of personal liability on Westin and Leech.[8]
 
 
 12
 The case was tried to the district court sitting without a jury. The district court found in favor of J-R Grain on the breach of contract claim and awarded substantial damages, including incidental and consequential damages. The district court, however, found no evidence of fraud, conspiracy or inadequate capitalization. Judgment was entered against FAC only. This appeal followed. Our review is limited:
 
 
 13
 Unless we determine that these findings by the district court are clearly erroneous, we are bound to uphold its decision. And a finding of fact is only deemed clearly erroneous if it is not supported by substantial evidence, if it proceeds from an erroneous conception of the applicable law, or if on a consideration of the entire record the appellate court is left with the definite and firm conviction that a mistake has been made.
 
 
 14
 Southern Illinois Stone Co. v. Universal Engineering Corp., 592 F.2d 446, 451 (8th Cir. 1979).[9]
 
 III. Conspiracy and Fraud
 
 15
 First, J-R Grain argues that the district court erred in failing to find that Westin, Leech, FAC and Feaster Foods Co. engaged in a conspiracy to defraud J-R Grain by misrepresenting the financial condition of FAC and by using the misleadingly similar name "Feaster Foods Agricultural Co." J-R Grain argues that Westin, Leech and Feaster Foods Co. conspired to use FAC as a corporate "shield" for their speculation in the then-lucrative fertilizer market. We disagree.
 
 
 16
 In this diversity case the district court applied Nebraska law, which holds that
 
 
 17
 (a) civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means. . . . The principal element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury.
 
 
 18
 Stillinger & Napier v. Central States Grain Co., 164 Neb. 458, 82 N.W.2d 637, 645 (1957), citing Rettinger v. Pierpont, 145 Neb. 161, 15 N.W.2d 393, 411 (1944). The district court found that there was simply insufficient circumstantial evidence from which to infer Westin, Leech and Feaster Foods Co. entered into an agreement to defraud J-R Grain. We do not find this conclusion to be clearly erroneous.
 
 
 19
 Second, we note that the district court also found no evidence of fraud.
 
 
 20
 The essential elements required to sustain an action for fraud are, generally speaking, that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.
 
 
 21
 Bellairs v. Dudden, 194 Neb. 5, 230 N.W.2d 92, 97 (1975), citing Transportation Equipment Rentals, Inc. v. Mauk, 184 Neb. 309, 167 N.W.2d 183, 186 (1969).[10]
 
 
 22
 The district court concluded that there was no evidence Westin made any representations to J-R Grain before the execution of the contract. Apparently Leech was the sole contract between FAC and J-R Grain. The district court further found no evidence to establish an agency relationship between Leech and Westin. With regard to Leech's representations[11] to Maher, the district court found that Leech's statements were substantially correct.
 
 
 23
 In addition, the district court, noting that Maher and Dorman were experienced and knowledgeable businessmen, determined that their reliance upon Leech's representations was not justified, especially in view of Leech's failure to produce a FAC financial statement as requested. J-R Grain apparently relied upon the mistaken impression of Mr. Shipporeit, the Cargill representative, and failed to do any independent checking of FAC's corporate structure or financial condition. "The general rule is that where ordinary prudence would have prevented the deception, an action for the fraud perpetrated by such deception will not lie." Growney v. C M H Real Estate Co., 195 Neb. 399, 238 N.W.2d 240, 242 (1976), citing Swanson Petroleum Corp. v. Cumberland, 184 Neb. 323, 167 N.W.2d 391, 396 (1969).
 
 
 24
 Finally, the district court concluded that Westin and Feaster Foods Co. did not permit FAC to use the corporate name "Feaster Foods Agricultural Co." with an intent to deceive the public.
 
 
 25
 We do not find these findings to be clearly erroneous.
 
 IV. Inadequate Capitalization
 
 26
 Nebraska case law follows the general rule that
 
 
 27
 a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of a legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.
 
 
 28
 United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (C.C.D.Wis.1905) (Sanborn, J.); see, e. g., Scribner Grain & Lumber Co. v. Wortman, 204 Neb. 92, 281 N.W.2d 394, 395-96 (1979); Massachusetts Bonding & Insurance Co. v. Master Laboratories, Inc., 143 Neb. 617, 10 N.W.2d 501, 506 (1943). J-R Grain argues that the district court should have disregarded the corporate entity[12] and thus held Westin and Leech personally liable as FAC shareholders. J-R Grain argues that Westin and Leech should not in fairness be permitted to raise limited corporate liability as a defense because they inadequately capitalized FAC and, in the face of adverse financial consequences, effectively "looted" FAC by transferring most of its corporate assets without consideration to D & D Commodity.
 
 
 29
 "Adequate initial financing should not be confused with formal minimum paid-in capital requirements applicable in several jurisdictions." H. Henn, Law of Corporations § 146, at 253 n.18 (2d ed. 1970). As noted by the district court, there appears to be no minimum paid-in capital requirement under Nebraska law.
 
 
 30
 "Inadequate capitalization" as used here (by J-R Grain) means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails. Inadequate capitalization is measured at the time of formation of the corporation. A corporation that was adequately capitalized when formed but has suffered losses is not undercapitalized. Whether a corporation is undercapitalized obviously presents a question of fact that turns on the nature of the business of the particular corporation.
 
 
 31
 Hamilton, The Corporate Entity, 49 Tex.L.Rev. 979, 985-86 (1971) (footnotes omitted). See also Henn, supra, § 146, at 252-54 & n.21.
 
 
 32
 The district court applied the general rule that inadequate capitalization is a factor to be considered in determining whether to disregard the corporate entity. J-R Grain Co. v. FAC, Inc., Civ. No. 75-0-261 (D.Neb. Mar. 12, 1979) (slip op. at 10, citing Annot., 63 A.L.R.2d 1051 (1959)). The district court decided not to disregard the corporate entity, noting that J-R Grain failed to establish what an adequate level of capitalization would be in the fertilizer brokerage business. J-R Grain's witness Ral Wright testified that the fertilizer brokerage business did not require a "great deal" of capital.
 
 
 33
 We do not find the district court's decision on this point was clearly erroneous.[13]
 
 V. Director Liability
 
 34
 Finally, J-R Grain argues that the district court erroneously failed to hold Westin and Leech personally liable as directors of FAC for transferring its assets without consideration to D & D Commodity and thus defrauding J-R Grain as a creditor of FAC, citing in support part of the Nebraska Business Corporation Act, Neb.Rev.Stat. § 21-2046(3) (reissue 1977).[14] J-R Grain argues that the issue of directors' liability, although admittedly not raised by the pleadings, was raised at trial, tried by implied consent of the parties and should have been decided by the district court. See Fed.R.Civ.P. 15(b), 54(c).
 
 
 35
 The district court did not address this issue, stating in a footnote:
 
 
 36
 As a caveat, the Court expressly disclaims that this Memorandum decides, either directly or by implication, what rights, if any, the plaintiff may have against FAC, Inc., or its officers and stockholders, or D & D (Commodity) Company, or its officers and stockholders, for any monies allegedly due FAC, Inc., for unpaid capital stock subscriptions, if any, or for funds or property transferred without adequate compensation, if any, or any other reason.
 
 
 37
 J-R Grain Co. v. FAC, Inc., supra, slip op. at 10 n.6. In the context of the present case, this was a determination by the district court that the issue of directors' liability had not been raised at trial. We have reviewed the entire record and cannot say this determination was clearly erroneous. While we in no way express any opinion on the merits of such a claim, we note that the district court expressly left open the possibility of future litigation in a separate action against FAC and its officers and stockholders or D & D Commodity and its officers and stockholders.
 
 
 38
 Accordingly, the judgment of the district court is affirmed.
 
 
 
 [1]
 The Honorable Richard E. Robinson, United States Senior District Judge for the District of Nebraska
 
 
 [2]
 The corporate defendants below were FAC and Feaster Foods Co.; the individual defendants were Westin and Leech. FAC and Leech were served with process and filed an answer to the complaint. Subsequently, their counsel was granted leave to withdraw. The district court was not informed whether they retained new counsel; all notices and orders were mailed to Leech's last known mailing address. The mail was returned because Leech had moved without leaving a forwarding address. Neither Leech nor FAC was represented by counsel at trial; only Westin and Feaster Foods Co. have filed a brief on appeal
 
 
 [3]
 This factual summary is based upon the excellent memorandum opinion of the district court. J-R Grain Co. v. FAC, Inc., Civ. No. 75-0-261 (D.Neb. Mar. 12, 1979)
 
 
 [4]
 Feaster Foods Co. is a Nebraska corporation engaged in the business of buying and selling feed and grain. It was originally a one-man business founded by an individual named Don Feaster. After the death of Feaster in 1966, the company was incorporated. Westin is the president of Feaster Foods Co. and he and members of his immediate family are the sole shareholders. (Westin married Diane Feaster, the daughter of the founder.) Feaster Foods Co. enjoys a good business reputation in the grain market. Its business address is Suite 206, 4223 Center Street, Omaha, telephone 553-3363
 
 
 [5]
 This contract thus involved approximately $872,500
 
 
 [6]
 Appellees Westin and Feaster Foods Co. dispute this characterization of the transaction by the district court; they argue that J-R Grain never had possession or title to the fertilizer and did not dispose of the fertilizer by resale but instead agreed to pay a fixed amount in order to cancel the supply contracts
 
 
 [7]
 D & D Commodity used FAC's former business address and telephone number, customer list and accounts. Feaster Foods Co. personnel performed all bookkeeping and secretarial services for D & D Commodity under a management agreement, as it had for FAC. Westin was the original shareholder in D & D Commodity. He paid $5,000 for 5,000 shares. Both Westin and Leech were paid salaries by D & D Commodity, which became quite successful. In January, 1976, Leech bought out Westin's shares in D & D Commodity and in FAC
 
 
 [8]
 J-R Grain also asserted a claim under the federal securities laws, but this claim was dismissed before trial
 
 
 [9]
 In applying the clearly erroneous standard,
 (i)t is not the function of an appellate court to try the case de novo, or to pass upon the credibility of witnesses or on the weight to be given to their testimony, and a finding is not clearly erroneous simply because a different result might have been reached had the case been tried originally to the appellate court. However, a factual finding that is based upon the application of an erroneous legal standard cannot be upheld.
 Shull v. Dain, Kalman & Quail, Inc., 561 F.2d 152, 155 (8th Cir. 1977) (citations omitted), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). Furthermore, we give great weight to the district court's determination of local law in diversity cases. E. g., American Motorists Ins. Co. v. Samson, 596 F.2d 804, 807 (8th Cir. 1979); Bazzano v. Rockwell Int'l Corp., 579 F.2d 465, 469 (8th Cir. 1978); Merchants Mut. Bonding Co. v. Appalachian Ins. Co., 556 F.2d 899, 902 (8th Cir. 1977).
 
 
 [10]
 See also Neff v. World Publishing Co., 349 F.2d 235, 255 (8th Cir. 1965) (applying Nebraska law); Moser v. Jeffrey, 194 Neb. 132, 231 N.W.2d 106, 109 (1975); Buhrman v. International Harvester Co., 181 Neb. 633, 150 N.W.2d 220, 223 (1967)
 
 
 [11]
 As noted earlier, Leech told Maher and Dorman that his "partner" (Westin) owned a bacon bits plant and was in the process of buying a dairy in Omaha and that he had a "home" for the entire 2,500 tons of fertilizer
 
 
 [12]
 Everyone understands that a corporation, as a "legal entity," normally bears sole liability for debts created in its own name. Nevertheless, courts sometimes hold the shareholders liable for the corporate debts by saying that the "corporate veil" should be "pierced" or that the corporation is the "alter ego" or "instrumentality" of the shareholders. This language is inherently unsatisfactory since it merely states the conclusion and gives no guide to the considerations that lead a court to decide that a particular case should be considered an exception to the general principle of nonliability
 Hamilton, The Corporate Entity, 49 Tex.L.Rev. 979, 979 (1971).
 
 
 [13]
 In addition, this writer is of the opinion that the courts should be particularly reluctant to disregard the corporate entity in cases involving contract liability as opposed to tort liability
 In contract cases the separate existence of a minimally capitalized corporation should usually be recognized. . . . (I)f a person knowingly deals with an undercapitalized corporation he is, in effect, assuming the risk of loss if the transaction does not work out. If the person does not wish to take this risk, he should insist that the shareholders themselves enter into the contract or personally guarantee performance by the corporation. Indeed, transactions are often entered into in the name of a shell corporation precisely because the shareholders do not wish to assume personal liability. A refusal by a shareholder to assume personal liability when requested to do so presents the strongest case against judicial imposition of that liability. Where the parties themselves are apportioning the risk of loss through their relative bargaining power, there is no reason for a court to disturb this allocation of risk.
 Hamilton, supra note 12, at 986. Professor Hamilton does recognize that misrepresentation of the financial status of the corporation to third parties could be a reason for imposing shareholder liability. Id. at 987. "Situations involving duress, coercion, unconscionability, or manifest unfairness arising from unequal bargaining power may also be envisioned." Id. at 988 & n.33. In the present case, the district court found no fraud.
 
 
 [14]
 Neb.Rev.Stat. § 21-2046(3) (reissue 1977) provides in part:
 The directors of a corporation who vote for or assent to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or making adequate provision for, all known debts, obligations, and liabilities of the corporation shall be jointly and severally liable to the corporation for the value of such assets which are distributed, to the extent that such debts, obligations and liabilities of the corporation are not thereafter paid and discharged . . . .
 J-R Grain also argues that the issue of directors' liability was before the court because its complaint was in effect a claim for money and a claim to set aside a fraudulent conveyance, joinder of which is expressly permissible under Fed.R.Civ.P. 18(b) and case law. See, e. g., Huntress v. Huntress' Estate, 235 F.2d 205, 207-08 (7th Cir. 1956). A party may, of course, join contingent claims. As we understand the facts of the present case, J-R Grain thus argues that the transfer of corporate assets from FAC to D & D Commodity was a fraudulent conveyance. Even assuming for the purpose of argument that the transfer was fraudulent, the district court could not have entered judgment against D & D Commodity because D & D Commodity was not a party defendant.